| | | |
|---|---|---|
| PATRICIA PORTER KRYDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ESTATE OF JAMES KEMMLER | ) | |
| ROGERS, JENNIFER ROGERS- | ) | |
| ETCHEVERRY, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | No.: 1:13-cv-00048 |
| JENNIFER ROGERS-ETCHEVERRY, | ) | Chief Judge Crenshaw |
| as administrator for the ESTATE OF | ) | |
| JAMES KEMMLER ROGERS, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICIA PORTER KRYDER, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## MEMORANDUM OPINION

What should be a routine skirmish over the enforceability of a Promissory Note between the maker, Patricia Porter Kryder ("Kryder"), and the holder, James Kemmler Rogers ("Rogers"), has escalated into a protracted battle, with campaigns fought in both state and federal court. The case was launched with a preemptive strike by Kryder in the form of a declaratory judgment action in the Chancery Court of Giles County, Tennessee. The front moved here, when the case was removed based upon diversity jurisdiction.

Now in its fourth year, and before its second federal judge, the case has survived Rogers.

Almost two years after a judicially conducted settlement conference failed to provide a negotiated truce, Jennifer Rogers-Etcheverry ("Etcheverry"), as special administrator of Rogers' estate, filed a Motion for Summary Judgment (Doc. No. 136) seeking an end to the conflict. This is her second such attempt, and the third attempt at partial or complete summary judgment filed by the parties. Unfortunately, Etcheverry's Motion will not bring a total halt to the hostilities.[1]

## I. Background

In the Complaint filed in the Giles County Chancery Court, Kryder alleged that, in 2007, she and Rogers entered into a "landlord/tenant" agreement whereby Rogers would live in her Lynnville, Tennessee residence in exchange for providing general care-taking services and paying $1,500 per month rent, plus $150 per month for each of the four horses that Rogers pastured on the land. This was not a typical landlord/tenant agreement, however. Rogers, who was on a fixed income, was not required to pay the rent he owed each month. Instead, the parties would "settle up" at mutually agreeable intervals when Rogers had available funds.

The Complaint also alleges that on January 9 or 10, 2010, Kryder and Rogers agreed that Rogers would become current and pay future rent by advancing Kryder a lump sum payment of $50,000. This agreement was to be set out in a Promissory Note for that amount, with the understanding that the principal would be reduced each month as Rogers' rent and pasture fees became due.

Immediately thereafter, on January 11, 2010, a fire destroyed Kryder's utility building and

---

[1] Hope springs eternal and, before this Court undertook the arduous task of wading through the record and formulating an opinion, the Magistrate Judge ordered the parties to participate in another judicially-conducted settlement conference. (Doc. No. 168). Any hope that the parties could amicably resolve their differences, however, was dashed on October 16, 2017, when the parties appeared before a second Magistrate Judge but were unable to reach an accord. (Doc. No. 176).

carport, damaged her house, and destroyed surrounding landscaping and trees. Kryder demanded that Rogers reimburse her for "certain damages" caused by the fire, and Rogers agreed to do so when he had available funds, including using a frequent flyer credit card with payment made for Kryder's benefit.

On January 15, 2010, Kryder executed a Promissory Note in the principal amount of $50,000. Rogers later agreed to advance Kryder an additional $50,000. Kryder executed a second Promissory Note on April 16, 2010 in the amount of $100,000, which consolidated the two Notes. As with the prior Note, the principal was to be reduced each month as Rogers' rent and pasture fees accrued. It was also to be reduced, Kryder alleged, by the amount of Rogers' responsibility for the fire loss, once that amount was finally determined. Kryder claims that, some time later, Rogers used his frequent flyer credit card for her benefit in the amount of $56,633.17, "which represented his past-due rent and pasture fees through December 2009." (Doc. No. 1-1, Complaint ¶ 14).

On May 18, 2012, Rogers was seriously injured in an automobile accident in Giles County and airlifted to Vanderbilt University Hospital in Nashville. Kryder informed Rogers' daughter Etcheverry, who was living in California, about the accident and the extent of her father's injuries. However, and unbeknownst to Kryder, Etcheverry immediately boarded a flight to Nashville, rented a van, drove to Kryder's farm, entered the residence without permission, and "removed documents, including evidence of the various business transactions, 'settling up' of the rent, and note obligations between Kryder and Rogers." (Id. ¶ 19). Etcheverry later "admitted to law enforcement that she removed the documents and other property while Kryder was at Rogers' hospital bedside." (Id.).

Kryder also alleged that, on June 3, 2012, Etcheverry removed Rogers' remaining personal property from Kryder's residence and, thereafter, Etcheverry and Rogers flew on a private jet to

California. Then, on September 12, 2012, and at a time when Rogers was "mentally incapacitated," Etcheverry, through her attorney, sent Kryder a letter alleging that Kryder had failed to pay interest on the two Notes, and demanding that the balance be paid with interest, even though the face of the $100,000 Note acknowledged that the $50,000 Note had been satisfied. This was followed by another letter dated February 20, 2013, that demanded Kryder pay the entire April 16, 2010 Note, together with interest by March 15, 2013. In response, Kryder informed counsel that Rogers actually owed her at least $40,000 for past due rent, pasture fees and damages resulting from the fire.

Based upon the foregoing, Kryder asserted claims for breach of contract/procurement of breach; breach of the implied duty of good faith and fair dealing; and *quantum meruit* against Rogers and Etcheverry. She also sought an accounting and a declaration that Etcheverry and Rogers were obligated to apply all pre-paid interests, debts for rent and pasture fees, the damages resulting from the fire to the April 16, 2010 Promissory Note.

After the case was removed to this Court on May 16, 2013, Kryder filed an Amended and Restated Complaint (Doc. No. 80) that re-alleged the same facts and asserted the same causes of action. In response, Etcheverry and Rogers filed an Answer and Counterclaim that was twice amended.

In the controlling Second Amended Answer and Counterclaim, Etcheverry and Rogers deny most of the pertinent allegations made by Kryder. They concede that Kryder and Rogers entered into an agreement, whereby Rogers would stay at the Lynnville residence for an indefinite period of time, but claim that he was not obligated to pay rent, either for himself or his horses. Rather, Rogers was allowed to live on the property and pasture his horses there if he helped maintain the residence and performed general handyman duties, including mowing the lawn, hauling Kryder's

horses, exercising and feeding the horses, and repairing and maintaining the property.

Etcheverry and Rogers also concede that Kryder executed two Promissory Notes in favor of Rogers–one for $50,000 and the second for of $100,000. They claim, however, that the money advanced via the Notes was not for past or future rents, or to reimburse Kryder for the damages that allegedly resulted from the fire. Rather, the first $50,000 was advanced to Kryder to pay attorney's fees in her unsuccessful attempt to contest her parents' will, and another $50,000 was advanced to pay additional attorney's fees.

Etcheverry concedes that, upon learning of her father's accident and hospitalization, (which she claims not to have heard from Kryder), she flew to Nashville on May 20, 2012, and went to the Lynnville residence. Etcheverry claims, however, that she let herself in with a key that her father had provided to her and that she removed some of her father's personal belongings, which is the same thing she told the police officers. On June 3, 2012, while under Kryder's supervision and with her permission, Etcheverry removed the remainder of her father's personal property from the residence.

Based upon the Promissory Notes and the advancement of other money, the Counterclaim alleges breach of contract and unjust enrichment. It also seeks equitable relief in the form of a lien to be placed on Kryder's property, either in the form of a Deed of Trust in favor of Rogers to secure the Notes, or a lien *lis pendens* on the property for at least the balance of the unpaid interest on the Notes.

The Second Amended Answer and Counterclaim was filed by Etcheverry as the "attorney-in-fact for James Kemmler Rogers, an incapacitated person." After Rogers passed away on June 11, 2014, Etcheverry, on December 11, 2014, filed a Motion for Substitution (Doc. No. 81) requesting

that she be substituted for Rogers as the Counter-Plaintiff in her capacity as the Special Administrator of Roger's estate. By marginal Order dated December 19, 2014, (Doc. No. 82), the Motion was granted by then-Judge William J. Haynes, who was presiding over the case at the time. Kryder filed a Motion to Reconsider (Doc. No. 83), arguing that the Giles County Chancery Court was the proper jurisdiction for the estate to present Rogers' claims, and that Kryder, as a creditor, had filed a Petition to probate Roger's estate in that court. Judge Haynes rejected Kryder's arguments and confirmed the substitution by Order (Doc. No. 85) entered March 9, 2015.

As noted at the outset, the matter is before the Court on Etcheverry's Motion for Summary Judgment and, for that reason, the allegations made by the parties in the unverified pleadings are, to a great extent, irrelevant. However, the Court sets them out in detail because, quite frankly, the parties' Local Rule 56.01 submissions, and in particular their respective Statement of Undisputed Facts (Doc. Nos. 138 & 150), are unhelpful. Those filings fail to provide context, let alone flavor,[2] to the dispute between the parties. Furthermore, the parties rely on many of the allegations in advancing their arguments, as if the allegations were established facts.

It is only with the foregoing background that one can makes sense of the limited number of

---

[2] Even the Court's recitation of the allegations fails to do justice to the parties' apparent animosity towards each other and the lengths to which they will go to prevail on any issue, no matter how insignificant.

Kryder's "frivolous filings" in the Giles County Chancery Court ultimately led to the imposition of almost $35,000 in sanctions by that court against her and her counsel. This was not the only time Kryder and her lawyer were sanctioned for conduct arising out of this litigation. On September 27, 2016, they were ordered by Judge Haynes to pay "a total monetary sanction of $1,000" (Doc. No. 116 at 1) for their failure to provide discovery and to comply with an Order of the Court regarding the same.

Not to be outdone, Kryder moved to disqualify Etcheverry's counsel on the grounds that Kryder's former counsel entered into a "law association" with Etcheverry's counsel. That request was denied by the undersigned after a hearing. (Doc. No. 162).

Most recently, the parties have become embroiled in a controversy over the caption of the case. When Etcheverry began identifying the Counter-Defendant as "Patricia Porter Kryder a/k/a Patricia K. Ganier" and the Magistrate Judge included that language in the style of the case, Kryder took umbrage and filed a "Motion to Change Caption in Order" because "the use of an alias . . . is intended to harass" and "is needlessly hurtful" to her. (Doc. No. 170 at 1).

material facts on which the parties actually agree. Those facts are:

(1) Rogers lived on the Lynnville property from 2007 until he was injured in an automobile accident on May 18, 2012.

(2) Kryder drafted and executed two Promissory Notes in favor of Rogers. The first, signed January 15, 2010, was in the amount of $50,000. The second, signed April 10, 2010, was in the amount of $100,000.

(3) The $100,000 Promissory Note replaced the previous note[3] and (a) was to be secured by a Deed of Trust; (b) provided that Kryder would be responsible for attorney fee's, costs, and expenses if collection proceedings were necessary; and (c) required Kryder to pay four percent interest per year on the outstanding principal balance.

(4) The Promissory Note contained no acceleration clause. Instead, all principal and unpaid interest was to be paid on or before December 31, 2020.

(5) After execution of the Promissory Note, Rogers advanced Kryder $56,633.17 using his frequent flyer credit card.

(6) From May 2010 through December 2011, Kryder made monthly interest payments to Rogers.

(7) On January 11, 2010, a fire destroyed Kryder's utility building, carport, landscaping, and trees, and damaged her house.

(8) In April 2012, Etcheverry stayed at the Lynnville property and helped her father recover from hip surgery. No demands were made on the Promissory Note during time.

(9) On September 11, 2012, and again on February 20, 2013, counsel for Etcheverry sent Kryder a letter requesting payment to make the Note current.

(10) Rogers died on June 11, 2014, and Etcheverry's Motion to Substitute was thereafter granted.

(Doc. No. 149-1, Kryder's Reponse to Etcheverry's Statement of Facts ¶¶ 12, 14-18. 20-22; Doc.

No. 153, Ethceverry's Response to Kryder's Statement of Facts ¶¶ 3, 7, 9-22).

---

[3] Because the parties agree that the April 16, 2010 Promissory Note replaced and supplanted the prior note, the Court will refer to that controlling document simply as the "Promissory Note" or "Note" from this point forward.

## II.  Standard of Review

The standards governing summary judgment have been restated on countless occasions and are well known.  It suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, <u>Van Gorder v. Grand Trunk W. R.R., Inc.</u>, 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003).

## III.  Legal Analysis

Etcheverry seeks summary judgment on both her counterclaims and on Kryder's claims.  The Court considers Kryder's claims first.

### A.  Kryder's Claims

All of Kryder's claims, to wit, her claims for breach of contract/procurement of breach (Count One); breach of the implied duty of good faith and fair dealing (Count Two); quantum meruit (Count Three); accounting (Count Four); and declaratory judgment (Count Five) share a common ground.  They are all based, to a greater or lesser extent, on her repeated contention that Rogers failed to fulfill his obligations under the Promissory Note by refusing to (1) apply pre-paid interest, (2) credit his monthly rent and pasture fees, and (3) pay his fair share of the losses incurred as a result of the fire.  Kryder relies on two affidavits (Doc. Nos. 109 and 151) to support her

contentions.[4]  Her claims fail for both procedural and substantive reasons.

**1.**

Procedurally, Kryder's claims fail because Etcheverry was never substituted as a party Defendant in this action in accordance with Rule 25 of the Federal Rules of Civil Procedure.  So far as relevant, that rule provides:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties.  The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district.  Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided here for the service of the motion, the action shall be dismissed as to the deceased party.

Fed. R. Civ. P. 25(a)(1). Under this rule, "[a]fter the suggestion of death is filed, a 90-day countdown begins" and, within that period, "some other party or the executor or administrator of the deceased must move for substitution of the estate for the deceased, or the deceased's case will be dismissed." McKenna v. Pac. Rail Serv., 32 F.3d 820, 836 (3d Cir. 1994); see Pierce by Guardian v. Pemiscot Mem'l Health Sys., 657 F. App'x 613, 615 (8th Cir. 2016) ("If the motion for substitution is not timely made, then the action by . . . the decedent must be dismissed."); Unicorn Tales, Inc. v. Banerjee, 138 F.3d 467, 470 (2d Cir. 1998) (observing that a "party is given 90 days from the time when it learns from compliance with Rule 25(a)(1) of the death of an opposing party

---

[4] Attached to the first Affidavit is a copy of a "Revocable Trust," (Doc. No. 109-3), the significance of which is not clear.  In both her second affidavit and Response Brief, Kryder simply states that the Revocable Trust provided that, upon her death, Rogers could reside at her Giles County farm for life "without the payment of rent," and that, after the automobile accident, Etcheverry entered her home and removed documents, some of which related to Rogers "serving as Co-Trustee over [her] Revocable Living Trust." (Doc. No. 109 at 2; Doc. No. 149 at 5 & 6).  To the extent that Kryder relies upon the Revocable Trust to establish an oral understanding that rent, fees, and damages were to be deducted from the Promissory Note, that reliance is unavailing because those matters are not discussed in that document.

to take appropriate action"). "While the 90 day rule appears to be mandatory, Rule 6(b) authorizes the district court to exercise its discretion to permit a motion for substitution beyond the time originally prescribed when the failure to file the motion was the result of excusable neglect." Kaubisch v. Weber, 408 F.3d 540, 542 (8th Cir. 2005); see Cont'l Bank, N.A. v. Meyer, 10 F.3d 1293 (7th Cir. 1993) (same).

In this case, after the suggestion of Rogers' death was filed, the only Motion to Substitute was filed by Etcheverry and that request was very limited. Etcheverry specifically asked that she be substituted "as Special Administrator of the Estate of James Kemmler Rogers as the Counter-Plaintiff in this case," (Doc. No. 81 at 3), which was subsequently granted by Order (Doc. No. 82) of Judge Haynes. While Judge Haynes' Order merely stated "[t]he motion is GRANTED," any doubts as to its scope was removed when Judge Haynes entered a subsequent Order on Kryder's Motion to Reconsider in which he specifically noted that Etcheverry "filed a motion for substitution of real party in interest as the Counter-Plaintiff in place of the original Counter-Plaintiff, James Rogers." (Doc. No. 85 at 1-2).

There was never a suggestion in this case that Etcheverry would substitute as anything other than the Counter-Plaintiff, notwithstanding the fact that the Kern County, California Superior Court (where Rogers' estate was probated) gave her permission to "to substitute in as a defendant and cross-complainant." (Doc. No. 81-1 at 1). Indeed, it would make little sense for her to voluntarily become the Defendant in this lawsuit, unless, of course, she wanted to exhibit a largesse heretofore not displayed by the parties to this lawsuit. It was incumbent upon Kryder to move for that substitution, which she did not do.

Kryder relies on the "Sixth Circuit" decision in Watts v. Novartis Pharm. Corp., 2015 WL

1456647 (N.D. Ohio Mar. 30, 2015) for the proposition that "[a]fter the changes to Fed. R. Civ. P. 25, courts take a flexible approach to the substitution of parties." (Doc. No. 149 at 9). This proposition is true enough, but Watts, a district court decision, dealt with the issues of whether the plaintiff was a proper heir to be substituted, and whether the motion for substitution was timely. Watts does not help Kryder, who did not move to substitute Etcheverry as a Defendant. Furthermore, while Kryder points out that Rule 25(a) is discretionary because it provides that " the court may order substitution of the proper parties," this discretion presupposes a motion for substitution has been filed. See Kaplan v. Lehrer, 173 F. App'x 934, 935 (2d Cir. 2006) (stating that when a timely and proper motion is made, "the decision to permit substitution rests in the discretion of the court"); Baker v. Shelby Cty. Gov't, 2007 WL 2042453, at *1 (W.D. Tenn. July 12, 2007) (noting that "under the Rule, absent timely substitution, dismissal as to the deceased party is required").

**2.**

Even if Kryder was not required to file her own motion and the foregoing is nothing but "an excellent issue spotting question for an advanced civil procedure exam," Zanowick v. Baxter Healthcare Corp., 850 F.3d 1090, 1094 (9th Cir. 2017), there are a number of substantive reasons why summary judgment on her claims is warranted. Chief among them is Tennessee's Dead Man's Statute.

**a.**

The Dead Man's Statute provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a

> corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

Tenn. Code Ann. § 24-1-203. "The purpose of the Dead Man's Statute is to protect estates from spurious claims," and "is based on the common-law principle that an interested party will be powerfully tempted to misrepresent transactions or communications with a deceased person who cannot rebut the party's testimony." In re Estate of Marks, 187 S.W.3d 21, 28 n. 2 (Tenn. Ct. App. 2005); see Boote v. Shivers, 198 S.W.3d 732, 743 (Tenn. Ct. App. 2005) (identifying the same purpose and stating that "[i]t accomplishes this purpose by placing all parties in an action involving a decedent's estate on the same footing"). Although "[a] witness does not become wholly incompetent to testify when the statute applies, . . . the statute does limit the subjects a witness can address." Holliman v. McGrew, 343 S.W.3d 68, 73 (Tenn. Ct. App. 2009). "Accordingly, the Dead Man's Statute prevents interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate." Marks, 187 S.W.3d at 28 n.2. "Because it is an exception to the general rule, the statute must be strictly construed against the exclusion of testimony and in favor of its admission." Holliman, 343 S.W.3d at 73 (citing Haynes v. Cumberland Builders, Inc., 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976)).

Kryder argues that "the purpose of the Dead Man's Statute is for the exclusion of testimony, not for the exclusion of claims[.]" (Doc. No. 149). This is correct as a general proposition, but "under Federal Rule of Civil Procedure 56(e), the evidence submitted on a motion for summary judgment, in support of and in opposition to the motion, 'must set forth facts that would be admissible in evidence if offered at trial. Thus, irrespective of how [a state court] might decide this question, the federal rule requires exclusion of evidence on summary judgment motions which the

dead man's statute would exclude at trial." Pro Bono Invs., Inc. v. Gerry, 2005 WL 2429777, at *6 (S.D.N.Y. Sept. 30, 2005); see Broyles v. Woodson, 2005 WL 378929, at *8 (Tenn. Ct. App. Feb. 17, 2005) (affirming grant of summary judgment where, among other things, plaintiff's claims were barred by Tennessee's Dead Man's Statute); Lovejoy Elecs., Inc. v. O'Berto, 873 F.2d 1001, 1006 (7th Cir. 1989) (observing that if only evidence of fraud was a statement rendered inadmissible under the Dead Man's Statute, then opponent would be entitled to summary judgment); Ball ex rel. Hedstrom v. Kotter, 746 F. Supp. 2d 940, 948 (N.D. Ill. 2010) (considering Illinois' version of Dead Man Statute and holding that "the testimonial prohibition of the Dead Man's Statute is not limited to trial, and is applicable within the context of a summary judgment proceeding" under Rule 56).

Kryder also argues that the Dead Man's Statute "must be strictly construed as against exclusion of testimony and in favor of its admission," and cites In re Johnson v. Hall, 68 Tenn, 351 (Tenn. 1878) as "[a]n example of this admissibility standard[.]" (Doc. No. 149 at 12). This case, however is nothing like In re Johnson.

In In re Johnson, F. P. Hall leased to Mary Johnson's husband 16½ acres of land at $5 per acre and later, over Johnson's objection, testified at trial about the transaction. The Tennessee Supreme Court found "[t]here was no error in this" because "the suit was against [Johnson] in her own wrong, not as [her husband's] representative[.]" 68 Tenn. at 352. In fact, "[a]fter her husband's death, Hall desired her to surrender the possession of the land to him; she refused to do so, and cultivated it in 1877, and Hall elected to treat her as his tenant and hold her responsible for rent, which he had a right to do." Id. at 353. Here, in contrast, the only tenant was Rogers, yet Kryder seeks to recover against Etcheverry based upon oral understandings she allegedly had with Rodgers who is no longer around to testify.

13

Kryder also relies upon In re Estate of Jenkins, 1998 WL 221102, at *3 (Tenn. Ct. App. May 6, 1998) for the proposition that "[w]here business records of the decedent are 'loose and nebulous,' the dead man's statute cannot be used by the executor to prevent testimony about a beneficiary paying for expenses on a house owned by the decedent." (Doc. No. 149 at 13). That case, too, is inapposite.

In re Jenkins dealt with Conway Twitty's estate and the advancement of money to his children, with the understanding by him and his accountant that this money would be reduced from the children's inheritance. The only thing the appellate court said about the Dead Man's Statute was that "[t]he true facts as to what the intent of the deceased may have been as to classification of his gifts as advancements or loans, are obscured by the hearsay evidence rule and the 'Dead Man's Statute,'" and that "[w]hatever new law might be declared regarding the evasion of the effect of the dead man's statute by use of 'business records' is rendered inconclusive by the loose and nebulous dealings and record keeping of deceased and his children." 1998 WL 221102, at *4. The court said nothing that would diminish the continued validity of the Dead Man's Statute, and it remains alive and well in Tennessee. Moreover, while the probate court entered judgment in favor of the estate and against one of Twitty's daughters in the amount of $58,769.66, the appeals court reduced that to $1,524.16 because this was the amount the daughter agreed she owed her father. Id. at *5. Here, Etcheverry's position is that Rogers loaned Kryder more than $150,000. To reduce that amount Kryder apparently intends to testify about oral agreements with Rogers, which is clearly prohibited by the Dead Man's Statute.

**b.**

Even apart from the Dead Man's Statute, the relevant statute of limitations bars a central factual underpinning of the majority of Kryder's claims. Kryder contends that Rogers failed to compensate her for the loss caused by the fire, yet the fire occurred on January 11, 2010 and suit was not filed in the Giles County Chancery Court until April 15, 2013.

Under Tennessee law, "[a]ctions for injuries to personal or real property . . shall be commenced within (3) years from the accruing of the cause of action." Tenn. Code Ann. § 28-3-105.[5] Although more than three years elapsed between the fire and Kryder's suit, she contends the statute of limitations does not bar her any of her claims because of the discovery rule. More specifically, she argues that (1) unnamed insurance representatives told her in the fall of 2011 that Rogers was responsible for the fire; (2) in May 2012, a neighbor, also unidentified, told her Rogers confessed at the scene that he caused the fire by placing heat lamps in the outbuilding so that his cats could stay warm; and (3) it was not until May 28, 2010 that Kryder received a Giles County Fire Report stating that the fire ignited because of an "unattended heat source too close to the combustibles." (Doc. No. 109, Kryder Aff. ¶ 9).

---

[5] The Court recognizes that Count One of the Complaint alleges breach of contract and such actions are generally governed by a six-year statute of limitations as set forth in Tenn. Code Ann. § 28-3-109. However, the Tennessee Supreme Court has made clear that, in determining the applicable statute of limitations, "courts must ascertain the gravamen of each claim" by considering "both the legal basis of the claim and the injury for which damages are sought." Benz–Elliott v. Barrett Enters., LP, 456 S.W.3d 140, 149 (Tenn. 2015). Here, while Count One is couched as a breach of contract claim, a portion of the damages Kryder seeks in the form of an offset is Roger's alleged "responsibility for the loses and damages related to the fire and other damages at Kryder's farm." (Doc. No. 80, Amended Complaint ¶ 35). In this respect, Kryder is seeking damages arising from the loss of real property as a result of the fire, not damages for the alleged violation of a contract relating to the advancement of money. Regardless, and as explained below, Etcheverry has established that Kryder breached the contract based on the Promissory Note and is entitled to judgment as a matter of law on that issue.

"It is now well-established that, where applicable, the discovery rule is an equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." Pero's Steak & Spaghetti House v. Lee, 90 S.W.3d 614, 620 (Tenn. 2002) (citing Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 820 (Tenn. 1994)). "The discovery rule does not, however, toll the statute of limitations until the plaintiff *actually* knows that he or she has a cause of action." Id. (emphasis in original). "The plaintiff is deemed to have discovered the right of action when the plaintiff becomes aware of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of the defendant's wrongful conduct." Id. (citing Shadrick v. Coker, 963 S.W.2d 726, 733 (Tenn. 1998); Roe v. Jefferson, 875 S.W.2d 653, 657 (Tenn. 1994)). Thus, "'[m]ere ignorance and failure of a plaintiff to discover the existence of a cause of action is not sufficient to toll the running of the statute of limitations.'" Ralston v. Hobbs, 306 S.W.3d 213, 223 (Tenn. Ct. App. 2009) (citation omitted).

There are many problems with Kryder's proof regarding Roger's alleged responsibility for the fire, and when she allegedly learned about it. The fire report is not authenticated, but this is easily corrected. More problematic is Kryder's assertion that unnamed insurance representatives and a neighbor told her Rogers had some responsibility for the fire.

Rule 56 requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A declaration that relates what an "unidentified" person said and is "offered to prove the truth of the matter asserted . . . does not meet this standard." Guindon v. Twp. of Dundee, Mich., 488 F. App'x

27, 38 (6th Cir. 2012); see also, Williams v. Union Underwear Co., 614 F. App'x 249, 255 (6th Cir. 2015) (noting that a "statement by an unidentified third party is classic hearsay: a statement made out of court, which [the party] offers to prove the truth of the matter asserted"); Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005) (holding that a party's affidavit recounting inadmissible hearsay cannot be considered on summary judgment).

Moreover, the unknown neighbor's testimony about what Rogers allegedly said would not only be barred by the Dead Man's Statute, but would also be hearsay, and double hearsay if Kryder attempted to testify about the alleged conversation. Regardless, Kryder's suggestion that she did not know or reasonably could not have known that Rogers allegedly had some responsibility for the fire until much later is inconsistent with the allegations in the Amended and Restated Complaint.

In that Complaint, Kryder alleged that "[i]mmediately after the fire, Kryder demanded Rogers reimburse her for certain damages caused as a result of the fire" and "Rodgers agreed to reimburse said damages when he had funds available to do so." (Doc. No. 80, Complaint ¶ 11). Kryder also alleged that the principal on the $100,000 Promissory Note "was to be reduced in the amount of Rogers' responsibility for the fire loss, once that amount was determined, together with any remaining balance due from Rogers for damages to the premises." (Id.). These allegations confirm that Kryder knew or reasonably should have known that Rogers was to blame (or Rogers admitted culpability), long before Kryder received the fire report or heard from insurance adjusters and her neighbor.

As the Court previously noted when discussing the facts underlying this case, allegations in a complaint are largely irrelevant in the context of summary judgment. This is because "[o]nce the moving party has identified what it believes shows an absence of a genuine dispute of material fact,

the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Santiago v. Ringle, 734 F.3d 585, 589 (6th Cir. 2013) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)). Nevertheless, "'[f]actual assertions in pleadings . . . , unless amended, are considered judicial admissions conclusively binding on the party who made them.'" Kay v. Minacs Grp. (USA), Inc., 580 F. App'x 327, 331 (6th Cir. 2014) (quoting Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir.1988)). Therefore, "Plaintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit." Hughes v. Vanderbilt Univ., 215 F.3d 543, 549 (6th Cir. 2000). "Moreover, such admissions can undermine the timeliness of a plaintiff's claim." Id.; see also Davis v. A.G. Edwards & Sons, Inc., 823 F.2d 105, 107-08 (5th Cir. 1987) (holding that plaintiff was bound by admissions in his pleadings as to when he first discovered defendants' misconduct).

**c.**

The only cause of action that the Court can identify as not running headlong into the Dead Man's Statute, and/or the statute of limitations is Kryder's claim that Rogers and Etcheverry breached the implied duty of good faith and fair dealing when they purposefully accelerated the Note as alleged in Count Three of the Amended and Restated Complaint. There are a number of other problems with this claim, however, making summary judgment on it appropriate as well.

Kryder contends that Etcheverry, acting pursuant to a power of attorney when Rogers was incompetent, caused a demand letter to be sent that required full repayment in violation of the terms of the Promissory Note. This is explained in the following paragraph from the Amended and Restated Complaint.

[O]n February 20, 2013, exceeding her authority under the power of attorney given to her by her father, Defendant Rogers, and at a time Defendant Rogers was mentally frail and/or incapacitated, Defendant Etcheverry, through her counsel, demanded Kryder pay the entire face amount of the April 16, 2010 note, together with interest, on or before March 15, 2013, without application of any credits, and without application of any prepaid interest, and in addition that Kryder refund and repay all other sums advanced by Rogers to Kryder for his rent and other occupancy expenses. The letter stated that if payment of the sums demanded in the amount of $166,045.61 was not received, Defendant Etcheverry through her power of attorney was filing a legal action for collection of the demanded sums, attorney fees, and costs.

(Doc. No. 80 Complaint ¶ 39).

A substantially similar argument was considered and rejected by Judge Haynes in the context of Kryder's own Motion Partial for Summary Judgment. At issue there was a September 11, 2012 letter from counsel which stated, among other things, that "[u]nless the debt is paid in full, we will be insisting that the deed of trust be filed in accordance with the terms of the notes," and "request[ed] that either the principal sums be paid immediately or . . . that the notes be made current and you come within compliance of their terms on or before October 1, 2012." (Doc. No. 62-1 at 1). Judge Haynes found that there were "no genuine factual disputes for the jury to decide with respect to the letter," and that it was for the Court to "determine the legal effect" of the letter. (Doc. No. 87-1 at 13). Judge Haynes further ruled that there was no improper acceleration because the letter "request[ed] that either the principal sums be paid immediately or the note be made current and Plaintiff come within compliance of the terms of the note on or before October 1, 2012." (Id. (emphasis in original).

The February 20, 2013 letter at issue now was written by the same lawyer, but is worded more strongly. After observing that "no interest payment have been made since December 1, 2011," and that Kryder was "now in clear default of the Promissory Note," the "purpose of the letter" was to give Kryder "one opportunity to pay the amount owed bringing current all sums owed under the

Promissory Note, <u>or</u> expect that legal action will be taken," with a "collection attorney" instructed to "take whatever steps <u>are available under the Promissory Note</u>[.]" (Doc. No. 109-1 at 2 (emphasis added)). This was followed by the observation that Kryder could "accomplish this by paying the total balance of principal and interest in the amount of $166,045.61 on or before March 15, 2013." (<u>Id.</u>). Payment of the entire amount may have been wishful thinking on counsel's behalf, but Kryder was given the option of bringing her account current. <u>See</u> <u>Overholt v. Merchants & Planters Bank</u>, 637 S.W.2d 463, 467 (Tenn. Ct. App. 1982) (collecting cases for the proposition that improper acceleration occurs only when it is "exercised in a 'clear manner' evidencing an unmistakable purpose to that end").

Regardless, Kryder brings her claim as one for the breach of the duty of good faith and fair dealing. However, "[t]he Court of Appeals has held that in Tennessee there is no cause of action in tort for breach of the duty of good faith in the performance of a contract.'" <u>Wallace v. Nat'l Bank of Commerce</u>, 938 S.W.2d 684, 685 (Tenn.1996) (citing <u>Solomon v. First Am. Nat'l Bank</u>, 774 S.W.2d 935, 945 (Tenn. Ct. App.1989)); <u>see also</u> <u>Cohn Law Firm v. YP Se. Advert. & Publ'g, LLC</u>, 2015 WL 3883242, at *9 (Tenn. Ct. App. June 24, 2015) (citing <u>Wallace</u> and stating that a breach of good faith and fair dealing "complaint is premised on the parties' contract"). Here, the only contract Kryder had was with Rogers.

Furthermore, Kryder indisputably failed to pay monthly interest after December 2011 as required by the Note, and, "[u]nder the 'first-to-breach' rule, '[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract.'" <u>Advanced Concrete Tools, Inc. v. Beach</u>, 2014 WL 1385868, at *19 (M.D. Tenn. Apr. 9, 2014) (quoting <u>White v. Empire Exp., Inc.</u>, 395 S.W.3d 696, 716 (Tenn. Ct. App 2012)).

If, as Kryder contends, she did not make any more interest payments because "the accounts were reconciled in December 2011 and the note fully settled" (Doc. No. 149), then Etcheverry could not have breached or interfered with the non-existent contract.  See  Toxco, Inc. v. Transchem, LLC, 42 F. App'x 712, 714 (6th Cir. 2002) ("Just as an unenforceable contract cannot support claims of breach and inducement to breach, neither can a nonexistent contract support these claims."); W. C. James, Inc. v. Oil, Chem. & Atomic Workers Int'l Union, 646 F.2d 1292, 1295 (8th Cir. 1981) (affirming trial court's conclusion that a party "could not have fraudulently induced the breach of a non-existent contract"); Arcon Corp. v. Liberty Mut. Ins. Co., 591 F. Supp. 15, 18 (M.D. Tenn. 1983) ("Exactly how one could recover under a nonexistent contract is not made to appear.").

### d.

The long and the short of it is that "[a] party is entitled to summary judgment if his opponent cannot produce materials of evidentiary quality demonstrating the existence of a triable issue." Lovejoy Elecs., 873 F.2d at 1006. Thus, "[w]hen a defendant  moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of the plaintiff's claim . . . Rule 56 requires the plaintiff to present evidence of evidentiary quality that demonstrates the existence of a genuine issue of material fact.'" West v. Wayne Cty., 672 F. App'x 535, 541-42 (6th Cir. 2016) (quoting Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler, 106 F.3d 135, 145 (6th Cir. 1997)); see  Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) (citation omitted) (observing that the " nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe,'" and those facts "must have evidentiary value"). Kryder has not met her burden and summary judgment will be granted on her claims.

**B.  Etcheverry's Claims**

Given the ground that has already been plowed, Etcheverry's five-count Counterclaim can be resolved in a more succinct fashion.

**1.**

Count I is for breach of contract based on the Promissory Note.  "'The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract.'" Ingram v. Cendant Mobility Fin. Corp., 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006) (quoting ARC LifeMed, Inc. v. AMC–Tenn., Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). "To prevail on any breach of contract claim, the plaintiff must prove all elements." Hampton v. Macon Cty. Bd. of Educ., 2014 WL 107971, at *9 (Tenn. Ct. App. 2014).

Etcheverry has established all three elements of her breach of contract claim.  First, the $100,000 Promissory Note was an agreement in writing signed by the parties sought to be bound. Second, Kryder did not perform under the contract because she indisputably made no interest payments after December 2011, even though the Promissory Note required "from the date of draw through the date of repayment, interest at four percent (4.00%) per annum on the outstanding unpaid principal balance until such principal is paid in full."  (Doc. No. 70-2 at 2).  Further, the Note required that it be secured by a Deed of Trust filed in the Giles County Registrar's Office, which has not occurred.  Third, Etcheverry, as the administrator of her father's estate  has shown harm because she has not received the interest payments and the loan is not secured by the property as promised.

Kryder does not argue that the Promissory Note was not a contract or that the Note did not require interest payments, or the filing of a deed of trust.  She argues, instead, that the Note "clearly

focuses on amounts 'to become outstanding' in the future, and contemplates interest based on 'the date of draw through the date of repayment." (Doc. No. 149 at 21-22). She also claims to have "signed [the] note in advance of the extensions of credit to show that there was a cap or ceiling on the credit she requested." (Id. at 22). As such, Kryder asserts that "the amount in controversy remains disputed." (Id.). Insofar as the $100,000 amount is concerned, the Court disagrees.

"If a contract is unambiguous, a court must interpret it as written and not in accordance with a party's unexpressed intent." Williams v. Larry Stoves and Lincoln Mercury, Inc., 2014 WL 5308634, at *4 (Tenn. Ct. App. Oct. 15, 2014) (citing Pitt v. Tyree Org. Ltd., 90 S.W.3d 244, 253 (Tenn. Ct. App. 2002) and Sutton v. First Nat. Bank of Crossville, 620 S.W.2d 526 (Tenn. Ct. App.1981)). "In a dispute over the interpretation of a contract, [the court's] 'task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language.'" Eagle CDI, Inc. v. Orr, 2017 WL 2350156, at *4-5 (Tenn. Ct. App. May 31, 2017) (quoting Kafozi v. Windward Cove, LLC, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005)). "Determining the intent of the parties is a question of law 'because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left' to be decided by the court.'" Id. (quoting Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc., 78 S.W.3d 885, 889–90 (Tenn. 2002)). Moreover, because "[i]t is a 'central tenet of contract construction' that the intent of the parties at the time of contract execution is dispositive, . . . [t]hat intent is 'presumed to be that specifically expressed in the body of the contract.'" Id. (quoting Kafozi, 184 S.W.3d at 698).

"A Promissory Note is defined as 'an unconditional promise in writing to pay a person a sum of money," Williams, 2014 WL 5308634, at *9, and here the unconditional promise was for Kryder

to pay Rogers $100,000. Not only does the figure "$100,000" appear immediately below the caption "**Promissory Note**", the Note states that, "FOR VALUE RECEIVED," Kryder unequivocally "promise[s] to pay to the order of JAMES KEMMLER ROGERS . . . the principal sum of One Hundred Thousand Dollars ($100,000.00) in legal tender of the United States[.]" (Doc. No. 14-2 at 1).

The language "to become outstanding" that Kryder focuses on is in smaller font above the promise language and is written in the context of the consolidation of the two Notes: "This note replaces a previous note dated January 15, 2010, in the amount of Fifty Thousand Dollars ($50,000) in order to reflect a total amount to become outstanding of One Hundred Thousand Dollars ($100,000)." (Doc. No. 14-2 at 1). Read in context, the "total amount to become outstanding" refers to upping the Promissory Note from $50,000 to $100,000; it is not a suggestion that funds were to be forthcoming. Similarly, the term "from the date of draw through the date of repayment" does not suggest money that may or may not be forthcoming because there were two Promissory Notes with two different draw dates.

To the extent there is any ambiguity, Kryder admits that she is an attorney and prepared the Note. (Doc. No. 73, Answer ¶ 8). Because "Tennessee courts adhere to the general rule that ambiguities in a contract are construed against the drafter," Dog House Investments, LLC v. Teal Properties, Inc., 448 S.W.3d 905, 913 (Tenn. Ct. App. 2014) (citing Ralph v. Pipkin, 183 S.W.3d 362, 367 (Tenn. Ct. App. 2005)), Kryder cannot take advantage of the supposed ambiguity.

The plain construction of the note aside, Kryder cannot credibly argue that she did not receive the $100,000 reflected in the Note. In the Amended and Restated Complaint, Kryder alleges:

12. Rogers advanced funds to Kryder through his frequent flyer credit card, for which Kryder executed a note dated January 15, 2010 in the principal amount of $50,000.

13. Rogers later agreed to advance an additional Fifty Thousand Dollars ($50,000) to Kryder through use of his frequent flyer credit card, checks, and a wire transfer. In consideration of Rogers' agreements as a result thereof, the parties executed a subsequent note dated April 16, 2010 in the amount of One Hundred Thousand Dollars ($100,000). This April 16 note <u>consolidated the two (2) advances of Fifty Thousand Dollars ($50,000) each</u> and replaced, voided and nullified the January 15 note.

(Doc. No. 80, Complaint ¶¶ 12-13) (emphasis added).

Given the language of the Promissory Note and Kryder's own allegations, Etcheverry is entitled to summary judgment on her breach of contract claim. Because the Note contains no acceleration clause and the principal is not due until December 31, 2020, the breach at present is limited to unpaid interest, plus reasonable attorney's fees, expenses, and costs.

**2.**

Etcheverry is also entitled to an equitable lien as requested in Count III. "A court may decree an equitable lien 'in cases where the law fails to give relief and justice would miscarry but for its declaration.'" <u>Farmers Bank v. Holland</u>, 2012 WL 938934, at *2 (Tenn. Ct. App. Mar. 16, 2012) (quoting <u>In re Edgewater Motel, Inc.</u>, 121 B.R. 962, 973 (Bankr. E.D. Tenn. 1988)). "'[O]ne of the maxims underlying the doctrine is that equity regards as done that which ought to be done.'" <u>In re Estate of Burress</u>, 2003 WL 238820, at *6 (Tenn. Ct. App. Feb. 4, 2003) (quoting <u>Milam v. Milam</u>, 200 S.W. 826, 828 (Tenn. 1918)). The Tennessee Supreme Court has explained:

An equitable lien is a right, not recognized at law, to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt. It is not an estate or property in the thing itself, nor is it a right to recover the thing; that is, it is not a right which may be made the basis of a possessory action, but is merely a charge upon it.

*          *          *

> Even in the absence of an express contract, a lien, based upon the fundamental maxims of equity, may be implied and declared by a court of chancery out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. . .. There must be an intent to make the particular property, real or personal, a security for the obligation; but, that intent being clear, equity will treat an agreement to give a mortgage or lien, as effective to create an equitable lien, where money has been parted with on faith that there would be a compliance. . . . Thus it is apparent that, even in the absence of an express contract, an equitable lien may be created by implication, based upon the intention and circumstances of the parties. An equitable lien cannot, however, be based merely upon moral obligations alone, but must find a basis in established equitable principles.

Greer v. Am. Sec. Ins. Co., 445 S.W.2d 904, 907 (Tenn. 1969) (internal citations and quotation marks omitted).

Here, Kryder clearly agreed to encumber specified property as security for her obligation under the Note, and money changed hands on the belief there would be compliance with that promise. Specifically, the Promissory Note provided:

> This Note is to be secured in the amount of the principal and interest by a Deed of Trust on part of the same property conveyed to Maker by deed of record at Book 246, Page 760 in the Registrar's Office of Giles County, Tennessee, Map 29, Parcel 10.01.

(Doc. No. 14-2 at 1). Accordingly, Etcheverry is entitled to an equitable lien on that property to secure the interest that has not been paid, as well as the attorney's fees, court costs and other expenses that Kryder also agreed to pay should the Note be "placed in the hands of an attorney for collection or attempting to collect the indebtedness evidenced hereby." (Id.).

**3.**

With the conclusion that Etcheverry is entitled to recover past due interest and an equitable lien to secure that interest, the Court need not address her additional request for declaratory and

injunctive relief set forth in Count IV, or her "Lis Pendens" claim set forth in Count V. Count IV request an "injunction precluding Kryder from disposing of the Property" or "an Order requiring [her] to execute and record a Deed of Trust against the property." (Doc. No. 70, Counterclaim ¶ 47, 48). In Count V, Etcheverry "seeks to fix a lien *lis pendens* on the property for at least the balance of unpaid interest on the Note, plus reasonable attorneys' fees, court costs and other expenses incurred by [her] relating to this matter." (Id. ¶ 52). These requests are cumulative to the request for an equitable lien and will be denied as moot.

**4.**

That leaves Count Two of the Counterclaim alleging unjust enrichment. More specifically, Etcheverry claims that, following "execution of the Note in April 2010, Kryder continued to receive funds advanced to her from Rogers well in excess of the principal amount of the Note and Rogers expected to be repaid said funds and Kryder knew that Rogers expected to be repaid such funds." (Id. ¶ 31).

"The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005) (quoting Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 155 (1966)). While "a plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff," the "'most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust.'" Id. (emphasis added). This is unlike a gift, which is a "different animal with different elements" and is "'established by delivery with an intention to give' the property to the

other." Tennessee Rand, Inc. v. Automation Indus. Grp., LLC, 2010 WL 3852317, at \*25 (Tenn. Ct. App. Sept. 29, 2010) (quoting Roberts v. Baylor Sch., 2008 WL 204114 at \*5 (Tenn. Ct. App. Tenn. Ct. App. Jan. 25, 2008)).

Kryder admits that after the Note was executed, Rogers used his frequent flyer credit card for Kryder's benefit in the amount of $56,633.17, but claims that was for "past-due rent and pasture fees through December 2009." (Doc. No. 80 at 5). Etcheverry claims the actual amount was $56,633.17[6] and that "Rogers expected to be repaid said funds and Kryder knew that Rogers expected to be repaid such funds." (Doc. No. 70 at 16). Where the truth lies, the Court has know way of knowing. What is known is that summary judgment cannot be granted based simply upon either party's say-so. Summary judgment will not be granted on Etcheverry's unjust enrichment claim.

### IV. Conclusion

Based upon the foregoing, Etcheverry's Motion for Summary Judgment will be granted on all of Kryder's claims set forth in the Amended and Restated Complaint. The Motion will also be granted on Etcheverry's Counterclaim for breach of contract and her Counterclaim requesting an equitable lien. Etcheverry's Counterclaim for unjust enrichment will be denied. The remaining claims set forth in the Counterclaim will be denied as moot.

---

[6] This figure is based upon the fact that, from May 2011 through December 2011, Kryder made monthly interest payment in the amount of $522.72, which, by Etcheverry's calculation, represented monthly interest at 4% per annum on $156,817.15. The fact that monthly interest payments were made in this amount tends to support the position that Kryder agreed to an additional loan not incorporated by the Note, but this evidence is hardly conclusive on the issue. That is a piece of evidence which the jury can weigh.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE